BRUCE A. GIMBEL ET AL., EXECUTORS AND TRUSTEES (ESTATE OF FREDERIC A. GIMBEL) *v.* THE BERNARD F. AND ALVA B. GIMBEL FOUNDATION, INC., ET AL.

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued December 7, 1973—decision released February 19, 1974

*John N. Cole*, with whom was *David F. Babson, Jr.*, for the plaintiffs.

*David Goldstein* and *Harold Schwartz*, for the defendant Mary M. Tropp.

*Raymond W. Beckwith*, with whom was *Frank W. Estes*, for the named defendant.

*David J. Della-Bitta*, assistant attorney general, for the defendant attorney general of the state of Connecticut.

HOUSE, C. J. This is an action seeking advice as to the construction of a will, with particular reference to the extent of the powers granted to executors and testamentary trustees. The parties stipulated to the relevant facts and upon their agreement the case was reserved for the advice of this court in the form of answers to several stated questions.

Frederic A. Gimbel, hereinafter referred to as the settlor, a domiciliary of Greenwich, Connecticut, died on June 10, 1966, leaving a will dated May 7, 1964, which was duly admitted to probate by the Probate Court for the district of Greenwich on June 28, 1966. The plaintiffs, Eric C. Gordon and Bruce A. Gimbel, are executors of the will and trustees of a residuary trust established under article seventh of the will.

The settlor, who was seventy-four years of age at the time of his death, was not married in the

latter years of his life, had no children and for many years had relied greatly upon the companionship and nursing care of the defendant Mary M. Tropp, of whom he was very fond. The will made specific bequests to three friends and two specific charitable bequests. In article seventh of his will, the settlor then left the residue of his estate in trust with the income to be paid to the defendant Tropp for life and upon her death, the principal to be paid to the defendant Bernard F. and Alva B. Gimbel Foundation, Inc., hereinafter referred to as the foundation. The foundation is a charitable organization duly qualified as such for purposes of the Internal Revenue Code. The will did not provide for any power of invasion of the trust principal.

At the time of his death, the settlor's gross estate as reported on the federal estate tax return was valued at $3,332,636.75 and consisted in part of interests in seven oil and gas extraction programs sponsored by Occidental Petroleum Corporation and an interest in a similar program sponsored by Associated Oil and Gas Company, which interest was of minimal value. The value of all the oil and gas property participation interests owned by the settlor at the time of his death was $210,005.12 calculated at the then present commuted value of the anticipated revenue from the various programs. Between 1959 and 1963, certain agreements had been made by the settlor with Occidental in connection with its gas extraction programs. The details of these agreements are not material to the legal issues before us. It was provided generally that the settlor with others and Occidental would invest in the drilling of exploratory wells and share expenses incurred in and profits derived from the undertaking. The balance of the settlor's estate consisted

of listed securities, cash and miscellaneous personal property. The two largest items were 11,000 shares of Gimbel Brothers, Inc., valued at just under $600,000 and 41,600 shares of Occidental valued at $1,666,600.

The value of the residuary estate based on the date of death values and after payment of debts and administrative expenses, pecuniary legacies and taxes, was $1,784,730.80 which passed to the trust established under article seventh. The executors claimed a charitable deduction for federal estate tax purposes for the foundation's remainder interest under the trust in the amount of $1,031,735.03 which they claimed was the actuarial value of the remainder as computed under the federal estate and gift tax regulations. The Internal Revenue Service increased the valuation of two of the oil and gas interests by $40,466.90 and, more significantly, disallowed as a charitable deduction under § 2055 of the Internal Revenue Code the bequest of the remainder interest to the foundation "for the reason that the amount of such remainder interest is not presently ascertainable and, hence, is not severable from the non-charitable interests." The Internal Revenue Service imposed a federal estate tax deficiency, primarily due to the disallowance, in the amount of $450,569.86 with interest in the amount of $85,756.40 which was paid by the plaintiff executors who thereupon filed a claim for refund which was disallowed. The plaintiffs now have the right to bring suit against the United States in the appropriate court in an effort to recover the amount paid with interest, but they submit that the success of their tax suit will depend upon the proper construction of the will which, they assert, is a matter of the law of this state which law has not heretofore been

determined by this court. The United States of America was named a party defendant in this suit, but its motion to erase the action as to it for want of jurisdiction was granted by the court below. The attorney general of the state of Connecticut was made a party defendant and pursuant to § 3-125[1] of the General Statutes he appeared, joined in the stipulation and joined with the defendant foundation in filing a brief.

The question whether the estate under the applicable provisions of the Internal Revenue Code is entitled to the benefit of a charitable deduction for the residuary gift to the foundation is, of course, one which, if contested, must ultimately be determined by the federal courts. As was the situation in *Connor* v. *Hart,* 157 Conn. 265, 253 A.2d 9, however, the taxability of that gift will almost certainly depend on the extent of the powers, in the light of Connecticut trust law, accorded to the trustees in the management of the residuary trust created under the will of the settlor. As we noted in the *Connor* case (p. 271): "These powers may properly be determined by this court as a matter of construction of a Connecticut trust. Where, as here, there is an adversary proceeding prosecuted in good faith, we should expect that our decision would be accepted by the federal taxing authorities, as well as by the federal courts, as a correct determination of Connecticut law. See cases such as *Commissioner of Internal Revenue* v. *Estate of Bosch,* 387 U.S. 456, 465, 87 S. Ct. 1776, 18 L. Ed. 2d 886; *Doty* v. *Commissioner of Internal Revenue,* 148 F.2d 503, 505 (1st Cir.); *Old Colony Trust Co.* v. *Silliman,*

---

[1] General Statutes § 3-125 provides, in part, that the attorney general "shall represent the public interest in the protection of any gifts, legacies or devises intended for public or charitable purposes."

352 Mass. 6, 8, 223 N.E.2d 504; *Industrial National Bank of Rhode Island* v. *Rhode Island Hospital,* 99 R.I. 289, 293, 207 A.2d 286."

It is well settled that in the construction of a testamentary trust, the expressed intent of the testator must control. This intent is to be determined from reading the instrument as a whole in the light of the circumstances surrounding the testator when the instrument was executed, including the condition of his estate, his relations to his family and beneficiaries and their situation and condition. *Connor* v. *Hart,* supra, 275; *Connecticut Bank & Trust Co.* v. *Lyman,* 148 Conn. 273, 281, 170 A.2d 130.

The relevant dispositive provisions of the settlor's will are short and simple. The settlor gave, devised and bequeathed the residue of his estate "to my trustees hereinafter named, in trust nevertheless, to invest and reinvest the same and pay over the net income and profits and principal as follows: (a) To pay all of said net income to my friend, Mary M. Tropp, for and during the term of her natural life, in monthly payments or such other periodic payments as may be agreeable to her and to my trustees; (b) Upon her death to pay the principal of said trust to the Bernard F. and Alva B. Gimbel Foundations, Inc."

In contrast to the simplicity of these provisions, the thirteenth article of the will set forth in twenty-three paragraphs a detailed specification of rights, powers and authority granted to the trustees "in furtherance and not in limitation or restriction of those conferred upon them by law." The settlor expressly provided that any or all of these powers might be exercised by the trustees "in whole or in part, at any time or times and from time to time, in

their sole, absolute and uncontrolled discretion, in such manner as they deem advisable, without liability and without the necessity of obtaining any order or the approval of any court."

We set forth in a footnote[2] the nine questions upon which the parties have sought our advice. We deem it unnecessary to include in this opinion a full reprint of the lengthy twenty-three paragraphs of the thirteenth article of the will specifying the

---

[2] "A. May the plaintiffs invest in any oil and gas programs other than those in which the decedent was participating at the time of his death?

"B. With reference to the oil and gas program interests of the estate or any wasting asset of the trust or estate:

"(1) Must the executors and trustees pay all income to the income beneficiary without deduction therefrom for a depletion reserve?

"(2) Do the executors and trustees have discretionary power as to the deduction of income from the income beneficiary for a depletion reserve?

"(3) If the executors and trustees have discretionary power as to the deduction of income from the income beneficiary for a depletion reserve may they pay income to the income beneficiary without deduction therefrom for a depletion reserve?

"(4) If the executors and trustees must maintain a depletion reserve, may they by the amount which they established for such reserve materially alter the value of the respective beneficial interests of the income beneficiary and remainderman to the detriment of the remainderman?

"(5) May the executors and trustees charge operating expenses to the remainderman, to the extent of materially altering the value of the respective beneficial interests of the income beneficiary and remainderman to the detriment of the remainderman?

"C. Did the decedent intend by the provisions of his Will to authorize his executors and trustees to exercise any or all of the powers, authorities and discretions conferred upon them thereunder for the purpose, or with the effect, of substantially altering the value of the respective interests of the income beneficiary and the remainderman (1) in oil and gas property interests; (2) in the estate and trust assets, other than oil and gas property interests?

"D. May the executors and trustees exercise the powers, authorities and discretions conferred upon them by the Will in such a manner

powers granted to the trustees, the interpretation of which paragraphs must control our answers to the questions.[3]

### I

The first question (see footnote 2, A), to which all parties desire a negative response, is whether the plaintiff trustees may invest in any oil and gas programs other than those in which the decedent was participating at the time of his death. The plaintiffs claim that subparagraphs (m) and (w) of article thirteenth in the context of the will evince an intent by the settlor that as trustees they may invest and participate in only those oil and gas interests owned by the settlor at the time of his death. In subparagraph (m) the settlor empowered the plaintiffs to pay from principal the amounts they deem advisable for the protection of any property interests, further stating: "and, in particular, to invest any monies which they may deem advisable in the development, redevelopment and exploitation of any joint ventures, royalties, lands, leases and other interests in oil and gas and oil and gas properties which I may own or in which I may have an interest at the time of my death and to participate in the drilling or redrilling of any wells on

as to alter substantially the value of the respective interests of the income beneficiary and the remainderman (1) in oil and gas property interests; (2) in the estate and trust assets, other than oil and gas property interests.

"E. Are the executors and trustees subject to fixed judicial standards in the exercise of the powers, authorities and discretions conferred upon them by the Will?"

[3] To supplement portions of the provisions of article thirteenth which are expressly noted in the opinion, reference may be had to the bound volumes of records and briefs furnished by the reporter of judicial decisions to the various law libraries in the state. See General Statutes § 51-215.

lands or leases in such ventures and to do all manner of things necessary or proper for the exploitation and development of all interests in oil and gas ventures which I may own at the time of my death which they may deem advisable." Subparagraph (w) of article thirteenth empowers the trustees to retain for permanent holding the Occidental stock and "all interest in joint ventures, of which I may die seized or possessed at the time of my death, even though the same shall be when received or shall thereafter become wholly unproductive of income at any time or times and from time to time, and without in any event being chargeable for any loss or depreciation to my estate or to any trust fund which may result from any such retention." The language of subparagraphs (m) and (w) thus clearly authorizes the trustees to retain the settlor's wasting assets. These provisions concerning retained assets, however, do not necessarily preclude the trustees from new investments in wasting assets. Subparagraph (c) of article thirteenth concerning the investment powers of the trustees expressly authorizes them "[t]o invest and reinvest any money at any time in their hands, whether principal or accumulated income and whether held in trust or otherwise, for temporary as well as permanent holding, in any stocks, common, preferred or any other class, bonds, secured or unsecured, and other securities, foreign as well as domestic, commodities, foreign exchange, or other property, real or personal, of any kind or nature whatsoever, whether or not the same be of the kind which may, at the time of such investment or reinvestment, be approved, permitted or authorized by the courts, statutes or general rules of law for the investment of trust funds and even though

the same may be wholly unproductive of income, or speculative, and without in any event being chargeable for any loss or depreciation to my estate or to any trust fund which may result from any such investment or reinvestment."

The broad scope of the powers granted in subparagraph (c) permits the trustees to make investments which would otherwise be prohibited by the Fiduciary Powers Act, General Statutes §§ 45-100d —45-100f, or by general trust principles and exculpates the trustees from liability which they might otherwise incur. "One of the most reliable indications of an intention to permit a trustee to invest trust funds in non-legal investments is a statement in the will or trust instrument that the trustee shall not be limited to investments which are legal for trustees, or that the trustee may invest as he deems best, even though the investments may not be of the character authorized by law for the investment of trust funds." Note, 78 A.L.R.2d 7, 37; see 3 Scott, Trusts (3d Ed.) § 227.14; Bogert, Trusts and Trustees (2d Ed.) § 682. The broad investment powers granted by the settlor differ materially from those involved in *Title Guarantee & Trust Co.* v. *Bedford,* 125 Conn. 349, 5 A.2d 852, cited by the defendant attorney general and the foundation in their joint brief. In the *Title Guarantee* case, the trust instrument specified that the trust investments were to be in securities "under the laws of the State of Connecticut." *Title Guarantee & Trust Co.* v. *Bedford,* supra, 350.

In view of the extremely broad discretionary investment powers granted to the trustees, we cannot conclude that in the proper exercise of those powers the trustees are barred from investing in

any oil and gas programs other than those in which the settlor was participating at the time of his death. Accordingly, the answer to the first reserved question is "Yes."

## II

The second question reserved for the advice of this court consists of five inquiries with regard to the maintenance of a depletion reserve for the oil and gas program interests and any other wasting asset of the trust. See footnote 2, B (1)–(5).

Because of the inherent limited life of natural resources or other wasting property as a trust asset, when the income of a trust is payable to one beneficiary and the principal is ultimately payable to another, unless the settlor has manifested a contrary intent, a trustee "is under a duty either to set aside a part of the receipts from the property as an amortization fund and thus preserve the value of the principal of the trust, or to sell the property and invest the proceeds in proper trust investments." 3 Scott, op. cit. § 239; Bogert, op. cit. § 827; Restatement (Second), 1 Trusts § 239. None of the parties disputes the powers of the trustees to retain the wasting assets of the settlor's estate in light of the express authorization granted in the will, but the life beneficiary and the foundation as remainderman disagree whether it is mandatory or discretionary for the trustees to pay income from the wasting assets to the equitable life estate without deducting therefrom amounts for a depletion reserve.

In the common law of conventional legal life estates, the rule was that the owner for life of an interest in natural resources such as a mine or a well was entitled to profits only if the donor of the

life estate had at the time of the inception of the life estate already begun development of the resource. This was the "open mine" doctrine and rested on the theory that the settlor's imputed intent was that minerals in place are part of the inheritance but that the opening of new mines was waste and injurious to the reversionary interest. Bogert, loc. cit.; note, 18 A.L.R.2d 98, 101–103. To an extent, the rule was carried over to equitable life estates in the trust situation; ibid; but it has been discredited by modern authorities. Restatement (Second), 1 Trusts § 239. Section 9 of the Uniform Principal and Income Act, embodied in § 45-117 of the General Statutes, has rejected the "open mine" doctrine and provides that receipts from oil and gas interests, unless received as rent on a lease, shall be treated as trust capital.[4]

In the absence of the expression of a contrary intent by the settlor, the treatment of the trust receipts from the oil and gas program interests of the estate would be governed by the provisions of § 45-117 of the General Statutes. But the treatment of such receipts under the rules that existed at

---

[4] "[General Statutes] Sec. 45-117. DISPOSITION OF NATURAL RESOURCES. When any part of the principal consists of property in lands from which may be taken timber, minerals, oils, gas or other natural resources and the trustee or tenant is authorized by law or by the terms of the transaction by which the principal was established to sell, lease or otherwise develop such natural resources, and no provision is made for the disposition of the net proceeds thereof after the payment of expenses and carrying charges on such property, such proceeds, if received as rent on a lease, shall be deemed income, but, if received as consideration, whether as royalties or otherwise, for the permanent severance of such natural resources from the lands, shall be deemed principal to be invested to produce income. Nothing in this section shall be construed to abrogate or extend any right which may otherwise have accrued by law to a tenant to develop or work such natural resources for his own benefit."

common law, under general principles of modern trust administration and as provided by statute, are all subordinate to the treatment indicated by the intention of the settlor. The will contains two provisions relevant to the treatment to be accorded receipts from wasting assets. Article thirteenth, subparagraph (n),[5] expressly grants to the trustees authority to determine which receipts, irrespective of the source, shall be credited to income and principal, respectively, and to determine all questions respecting the apportionment of principal and income. Article fifteenth[6] of the will directs that neither the executors nor the trustees shall be "required" to make any provision for depreciation or "to create reserves for depreciation, obsolescence, amortization or other waste."

We can only conclude that the settlor left it to the trustees "in their sole, absolute and uncontrolled discretion" to determine which receipts from the oil and gas program interests and any wasting assets are to be credited to income and which to

---

[5] "[Article] THIRTEENTH: . . . (n) In the absence of a specific provision hereof or of any Codicil hereto with respect to any given disbursement or receipt, then notwithstanding the provisions of any statute or general rule of law to determine which disbursements, irrespective of the purpose thereof, shall be charged against, and which receipts, irrespective of the source thereof, shall be credited to income and principal, respectively; to apportion any such disbursements and receipts between income and principal; to determine all questions respecting the apportionment of principal and income."

[6] "[Article] FIFTEENTH: I direct that neither my Executors nor my Trustees shall be required to make any provision on account of the diminution or increase in value of any security or other property at any time constituting a portion of my estate or of any trust fund or for depreciation in respect to any tangible property or for the purpose of amortizing or making good any amounts paid as premiums on the purchase of securities or other property or to create reserves for depreciation, obsolescence, amortization or other waste or to" (sic).

principal and that while they are not required to create reserves for depreciation, obsolescence, amortization or other waste neither are they directed not to do so. In these circumstances, the answer to question B (1) is "No"; to B (2) is "Yes"; and to B (3) is "Yes." Since it is not mandatory that the trustees establish a reserve for depletion or other waste, question B (4) need not be answered.

## III

Questions B (5), C and D (see footnote 2) inquire whether the trustees may materially alter the respective beneficial interests of the income beneficiary and the remainderman either by charging operating expenses to the remainderman or in the general exercise of their administrative powers with regard to the trust assets.

Although the settlor imparted to the trustees the widest possible discretion, they are, nonetheless, under a duty to deal impartially with the successive beneficiaries. *Connor* v. *Hart,* 157 Conn. 265, 277, 253 A.2d 9; Restatement (Second), 1 Trusts §§ 183, 232. "[T]he interests of the two beneficiaries are to a certain extent antagonistic, and the trustee is under a duty so to administer the trust as to preserve a fair balance between them." 3 Scott, Trusts (3d Ed.) § 232. In the *Connor* case, we stated (p. 274): "Although the use of the term 'sole discretion' confers a wide discretion, no language in a trust will be so construed as to remove a trustee from equitable control. 'To the extent to which the trustees had discretion, the court will not attempt to control their exercise of it as long as they have not abused it. . . . But the law will not tolerate its abuse, however great the creator of the trust intended the grant of discretion to be.' *Conway* v.

*Emeny,* . . . [139 Conn. 612, 619, 96 A.2d 221]. This rule applies even when the will has used the term 'absolute' or 'sole' discretion. Ibid. The same rule is recognized in *Connecticut Bank & Trust Co.* v. *Lyman,* 148 Conn. 273, 281, 170 A.2d 130. The rule applies with perhaps even more rigor when, as here, a charitable trust is involved. *Ministers Benefit Board* v. *Meriden Trust Co.,* 139 Conn. 435, 448, 94 A.2d 917, and cases therein cited."

Paraphrasing what we further said in the *Connor* case: The administrative powers to determine what is principal and what is gross and net income and to allocate charges to either income or principal or both are powers often conferred in wills and here were included in a number of other administrative powers grouped together in article thirteenth of the will. It certainly would constitute a violent and wholly unwarranted repudiation and reversal of heretofore settled Connecticut trust law to construe any or all of these administrative powers conferred on the trustees as powers which, separately or collectively, authorized the trustees to destroy or cripple a charitable bequest and turn the foundation's principal over, in whole or in part, to the life beneficiary or, on the other hand, deprive the life beneficiary of the income from the principal of the trust during her life. "For the trustees so to do would be an impermissible and illegal abuse of discretion and would obviously be in violation of the settled rule that '[w]hen there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them.' Restatement (Second), 1 Trusts § 183." *Connor,* supra, 276.

While the settlor's will in article thirteenth both greatly enlarges the administrative powers of the

trustees and insulates them from liability for the exercise of those powers, they have been given no dispositive, as distinguished from administrative, powers and there is nothing in the will which would allow the executors and trustees to exercise any of their administrative powers to alter substantially the value of the respective interests of the income beneficiary and the remainderman either in the oil and gas interests or the other trust assets. Our answer to questions B (5), C and D is "No."

## IV

The final question submitted to us is E (see footnote 2): "Are the executors and trustees subject to fixed judicial standards in the exercise of the powers, authorities and discretions conferred upon them by the Will?" The parties have presented no precise question of the extent of their power to invest, to allocate a particular receipt or apportion a specific expense or loss, nor have we been able to ascertain what they mean by "fixed judicial standards" in the context of the present action. We can answer such a general question only with an equally general answer. The grant of broad powers and wide discretion to trustees does not remove them from the scope of the powers of judicial supervision. To the extent to which trustees have discretion, the court will not attempt to control their exercise of it as long as they have not abused it. *Bridgeport* v. *Reilly,* 133 Conn. 31, 36, 47 A.2d 865; *McCarthy* v. *Tierney,* 116 Conn. 588, 591, 165 A. 807. "But the law will not tolerate its abuse, however great the creator of the trust intended the grant of discretion to be." 2 Perry, Trusts and Trustees (7th Ed.), p. 862. "[N]o language in a trust will be so construed as to remove a trustee from equitable

control." *Connor* v. *Hart,* supra, 274. Clearly, in circumstances where trustees have abused their discretion, have failed to perform the duties of their trust or have acted dishonestly, a court of equity may intervene to protect and preserve the trust. In such circumstances, all fiduciaries are subject to judicial control, and, limiting ourselves to this extent, the answer to question E is "Yes."

No costs will be taxed in this court to any party.

In this opinion the other judges concurred.